IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONNIE E. WEATHERS,<br><br>    Petitioner,<br>v.<br><br>E. ROE, Warden,<br><br>    Respondent_____/ | No. 02-3310 MMC (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Lonnie E. Weathers ("petitioner"), a California prisoner proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After an initial review, the Court ordered respondent to show cause why the petition should not be granted based on petitioner's cognizable claims. Respondent has filed an answer, along with a memorandum and exhibits. Petitioner has filed a traverse, also supported by a memorandum and exhibits.

## PROCEDURAL BACKGROUND

In 1996, petitioner was charged in Alameda County Superior Court with murder and possession of a firearm by an ex-felon. Prior to trial, petitioner admitted to a prior felony conviction for possession of narcotics. At trial, the jury found petitioner guilty of second degree murder and possession of a firearm by an ex-felon, and found true special allegations as to personal use of a semi-automatic rifle, discharge of a firearm from a vehicle, and

personal infliction of great bodily injury. On November 6, 1998, the trial court sentenced petitioner to a total term of 30 years to life in state prison. The California Court of Appeal affirmed, and the California Supreme Court denied the petition for review. Petitioner's subsequent habeas petitions to the California Court of Appeal and California Supreme Court were denied.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the facts as follows:

    Esther Jones was shot and killed at around 2:15 p.m. on October 24, 1995, as she walked on Hillside Street near 94th Avenue in Oakland. She was the unintended victim of shots fired at a burgundy or maroon Chrysler Cordova driven by Dennis Armstrong during a "rolling gun battle" eastbound along Hillside. Jones was struck by a single .223 Remington bullet.

    Shirley Akens heard the shots from her house on 94th Avenue near Hillside. She ran into her driveway, from where she saw a "burgundy car in the street," occupied by Armstrong, two women and children. Armstrong got out of the car and yelled "mama." Akens then ran to the corner of 94th and Hillside, where she observed a "blue car" occupied by two "Black" people. The car was "going too fast" for Akens to identify the occupants. More gunshots were fired, apparently at Armstrong, from the passenger side of the blue car, before it sped away. Akens then noticed Esther Jones lying on the sidewalk.

    Oakland Police Officer Marvin Jackson and Evidence Technician Dan Hutchinson examined the scene of the shooting. The Chrysler Cordova driven by Armstrong was found on 94th Avenue north of Hillside with a tire and the back and front passenger side windows "shot out." The occupants of the car, Armstrong, two women and their two small children, were very excited, frightened and upset as they attempted to explain "what had just happened." One .380 shell casing was located at the intersection of 94th Avenue and Hillside, and another to the east at the corner of 98th Avenue. Two groups of a total of five .223 shell casings were discovered on Hillside Street just west of 94th Avenue, all fired by "the same firearm." Expert testimony was adduced that "7 different 223 rifles or carbines" fire .223 Remington bullets, the most common of which on the "streets of Oakland" is a Colt AR15 semiautomatic assault rifle.

    The investigation of the homicide was undertaken by Sergeant Michael Clark, who arrived at the scene shortly after the shooting. Clark soon realized that Armstrong was the "intended victim," and asked him some general questions before transporting him to the "homicide section" where he was interviewed further. Armstrong did not appear to be under the influence of any narcotics. He was "very helpful," and answered questions appropriately.

    In a taped interview that same afternoon, Armstrong stated that he drove Lanette Walker, Cecily Wade, and their two small children in the Chrysler Cordova to an apartment on 85th Avenue. Just after 2:00p.m., Armstrong saw appellant on 85th in another vehicle, a Pontiac Grand Am. Appellant just waved so Armstrong "didn't think nothing of it." Armstrong and his group were in the apartment for about five minutes. When they left, appellant's "vehicle was gone," but a few blocks later as they "headed back to 94th," Armstrong noticed that "the AM (sic) was following him." Armstrong recognized appellant, so he "threw his hands in the air to indicate, What's up?" After several blocks, Armstrong stopped his car, whereupon appellant jumped from the Grand Am and with an assault rifle that "looked like an AK," shot first into the ground,

2

then at Armstrong. Armstrong "took off," pursued by the Grand Am, with appellant shooting at them from the right front passenger seat. On 94th, Armstrong heard appellant yell, "I got to kill him. I got to kill him." When Armstrong reached his house, he laid his head on the steering wheel and pressed on the horn. He saw the Grand Am drive away down 94th. Armstrong indicated "off-tape" that he thought appellant "might have hit a lady on the street" during the chase.

Sergeant Clark testified that during the interview, Armstrong identified appellant's photograph in a lineup as the "one with the assault rifle" who "shot at him." He made a positive identification "fairly quickly," and Armstrong did not appear confused or unsure. Armstrong told Clark that he was familiar with appellant, whom he referred to as "Moore." Armstrong had previously seen appellant "selling drugs across the street" from the mini park on 84th Street, but did not know him well. About a week prior to the shooting of Jones, Armstrong's cousin Timothy Ross won money from appellant "shooting dice" on 90th and Bancroft. Appellant became angry and "swung at" Ross. Then, two days before the shooting, appellant arrived at Armstrong's house in a green, older model Malibu with a handgun. He complained about the dice game with Ross, and warned Armstrong that he "was coming back." The following two days, Armstrong saw appellant speed by his house as a passenger in a Grand Am, point a finger and yell, "I'm going to get you."

Armstrong subsequently identified appellant's brother Andre Moore and Charles Williams in other photo lineups as the rear passengers in the Grand Am. He made an initially "hesitant" photo identification of Reginald Soriano in another lineup as "the guy that was driving the car that was chasing him." During the interview, however, Armstrong stated that he did not get a good look at the driver, who wore a baseball cap and sat "real low in the car." Later, Armstrong identified Soriano as the driver by stating, "That's the guy, but I'm afraid of him." [Armstrong] expressed concern for the safety of himself and his mother. Sergeant Clark testified that he did not suggest any of the identifications to Armstrong.

Armstrong also directed the officers to a house on 85th Avenue across from a "minipark," where he thought appellant "hung out and sold drugs," Apprehensive about Armstrong's safety, Sergeant Clark gave him $20 for a hotel room after the interview was concluded.

Armstrong was interviewed again by Sergeant Clark the morning of October 30, 1995, at a house in the San Pablo-Richmond area, where Armstrong was staying after he heard "they were looking for him and were going to kill him." Armstrong reiterated his identifications, particularly his positive identification of appellant as the shooter. Armstrong's fear of Soriano was the reason he did not identify him immediately. Again, Sergeant Clark did not detect any symptoms of drug use by Armstrong.

Inspector Jefferey Harvey of the Alameda County District Attorney's Office assisted with another interview of Armstrong on July 31, 1998, during trial but before his testimony. Armstrong proclaimed that "he wasn't going to help in this case because he was already dead and there was nothing anybody could do for him." He expressed continued concern over "incidents" and "problems" his mother and sister suffered in the neighborhood "based on this set of circumstances and he didn't want any part of it." In response to questions about the motive for the shooting, Armstrong mentioned that his cousin had come to his house at 90th and Bancroft to ask for a gun due to a "conflict" over an acrimonious dice game. Armstrong told his cousin that he alone would use his gun, and proceeded to a gas station where he "put a gun to a man's head and told the person leave my cousin alone; if I have to talk to you again, I won't be talking." Appellant was among the group of people that he approached with the gun, but Armstrong did not identify him as the one at whom he pointed the weapon.

Sergeant Clark interviewed Lanette Walker and displayed a photo lineup to her the evening after the shooting. Walker gave a statement in which she described the shooting, and made a "hesitant" identification of Jaron Bradshaw, known to her as "Quincy," as one of the people involved. She had seen him a "couple of times" before.

3

She made no identifications from two other lineups shown to her. Walker indicated that she "ducked down" and did not get a view of those who were shooting.

Cecily Wade was interviewed twice by Sergeant Clark, the first occasion by telephone the day following the shooting, and then two days thereafter in person. During the second interview, Wade selected appellant's photograph as "the one with the assault weapon." She expressed no uncertainty in her identification. Wade also selected a photograph of Charles Williams from a lineup as a person "in the car that was chasing them." She did not identify Reginald Soriano, whose photograph was present in another lineup.

Following his arrest, on November 2, 1995, Reginald Soriano gave statements to Sergeant Clark. Soriano told Clark that on 85th Avenue at around 2:00 p.m on the day of the shooting he loaned his rental car, a green Grand Am, to appellant. In exchange and to repay a debt, appellant gave $50 to Soriano. Soriano then left to visit his cousin, and went from there to an appointment with his probation officer in Hayward at 3:00 p.m. Later that afternoon, he returned to 85th Avenue to reclaim his car. He heard that the Grand Am was parked on 99th Avenue, but had been involved in a shooting, so he exchanged it for a "red one." In the statement, Soriano mentioned that he also heard appellant "was supposed to have been the shooter."

At trial, Armstrong testified that he "didn't want to come" to the trial to appear as a witness. He admitted numerous prior convictions and current incarceration in state prison for a parole violation: failure to register as a drug offender. Armstrong testified that he knew appellant and considered him a friend. He recanted his previous identifications of appellant as the shooter, and his statements to Sergeant Clark that he feared for his safety. Armstrong denied or did not recall the prior statements he made to Clark, except the description of the dice game in which his cousin Timothy Ross was involved. He testified that he made and signed the identifications only after Clark suggested that he do so, and to "get it over with." The identifications of appellant as the shooter were mistaken. He remembered the shooting incident, but testified, "I don't know who shot at me." He was under the influence of heroin at the time of the shooting and when he gave statements to Clark. He used the $20 Clark gave him after the first interview to purchase heroin.

Cecily Wade was also reluctant to testify at trial. She was nervous [and] did not want to be considered a "snitch." Wade had known appellant and his brother Andre for a long time and saw them often in her neighborhood. On the day of the shooting, Wade was with Lanette Walker and their two children at a store on 96th and Olive. There she encountered her friend Armstrong, who agreed to drive the whole group in a "big burgundy car" to the house of Wade's godmother at 85th and Birch. On the way, at the minipark on 85th Wade exchanged greetings with appellant and his brother Andrew, who were "hanging around" outside appellant's house with "some more people" she did not recognize. Pointing to appellant, Armstrong mentioned that he had "put a gun up to his mouth" and "robbed him," but spared his life.

After a brief stay at Wade's godmother's house, the group returned to the burgundy car and proceeded along 85th to Birch Street with Armstrong again driving. He was "burning about something," although Walker did not know what. At the intersection of 85th and Birch, they saw appellant's brother Andre "smiling and laughing" as he pointed behind them. As Armstrong drove into the intersection, a dark green or gray car approached closely from the rear with "4 or 5 Darcy boys in the back." When Armstrong realized that the car behind was apparently pursuing him, he backed his car up, stopped, got out, threw his hands in the air, and yelled "What's up?" When Wade and Walker looked back, they saw guns, then heard gunshots. Armstrong jumped back in the driver's seat and warned everyone "to get down." Walker immediately ducked to the floor of the back seat with the children, and directed Armstrong "to go." Walker could not identify the "guy with the big gun" she observed on the right passenger side of the car, but Wade testified that she "saw Lonnie with the gun." They heard more gunshots in rapid succession as Armstrong drove away,

4

chased by the other car. Shots continued past them, and two of the windows were "shot out" as Armstrong drove to his mother's house on Hillside, where he said, "everybody get out." Walker looked up to see Armstrong's head against the horn. From out of the shattered back windshield, she looked at the other car driving away on 94th Avenue. Walker and Wade grabbed the children and ran into an apartment for help.[1]

Reginald Soriano testified unwillingly that just after 2:00 p.m. on the afternoon of the shooting he drove a rented green Grand Am to 85th Avenue, where he met appellant and two other people he knew "by face." Soriano trusted appellant, so he left the Grand Am with him while he went to his cousin's house, and from there to keep an appointment with his probation officer at 3:00 p.m. He did not see appellant get in the car or drive it before he left. When Soriano returned to 85th Avenue after 3:30 p.m., appellant was not present. He was told by others that his car was "on 99th." When he found the green Grand Am on 99th, parked "in front of somebody's house," the keys were "left in it." Soriano heard "rumors" that the car had been used in a shooting, so he exchanged it for another Grand Am, a red one. When he was first arrested for the murder of Jones, Soriano "didn't want to be involved with nothing," so he falsely told Sergeant Clark he had never been in the green Grand Am, and was with his girlfriend during the entire day of the shooting. In a subsequent interview a few days later, Soriano told Clark the truth, which was essentially the same version of the incident he described in his trial testimony. He denied that he was the driver of the green Grand Am during the shooting.

Appellant presented an alibi defense, in part with the testimony of his sister, Michele, who lived with her mother and brother Andre at a house on 85th Avenue on October 24, 1995. On that day at about 1:30 p.m. she left her brown, 1984 Buick Skylark, and $25 with appellant with instructions to get the car "detailed." Appellant drove away from the house and did not return until 4:00 p.m., with the car cleaned.

The owner of the "Sprinkle 'em Detail Center" located at 91st Avenue and East 14th Street in Oakland testified that appellant was a regular customer in October of 1995. According to a "work order" from October 24, 1995, a brown Buick that matched the description of Michele's car was given a "detail wash" at the shop that day. The work order also bore a handwritten notation of partial payment of $20 made by "Lonn." The work order did not have a vehicle license number or customer name on it. A detail wash takes from one to two hours, and some customers leave while the work is done.

Appellant testified that he took Michele's brown Buick to the detail shop at 2:00 p.m. the afternoon of the shooting. Appellant waited at the shop while the detail work was done. The work took "about an hour," after which he drove directly home to 85th Avenue, arriving there at almost 3:30 p.m. He did not have a gun in his possession that day, never saw the green Grand Am, and did not take part in the shooting.

On cross-examination, appellant denied that he had participated in a dice game five days before the shooting, that he was acquainted with Armstrong "at all," or that Armstrong had robbed him and his friends at gunpoint at the Shell gas station on Bancroft on October 19, 1995. Appellant repeatedly claimed that the prosecution witnesses were "lying" when they connected him with the shooting and preceding events. He admitted that he had previously been convicted of a "felony." Although appellant denied that he ever used the name Moore, his "rap sheet" indicated use of the aliases Maurice Lonnie Moore and Andre Moore in conjunction with prior felony convictions.

People v. Weathers, No. A085327, slip op. 1, 1-8 (Cal. Ct. App. Mar. 15, 2001) ("Slip Op.")

---

[1]Except where noted, the matters in this paragraph were observed by, and testified to at trial by, both Walker and Wade.

5

(attached as Respt.'s Ex. G).

# DISCUSSION

A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

Under the 'contrary to' clause of 28 U.S.C. § 2254(d)(1), a federal habeas court "may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 412-13.

B.  Legal Claims

Petitioner claims he is entitled to habeas relief because his trial counsel provided ineffective assistance in violation of his Sixth Amendment right to counsel. Specifically, petitioner claims his counsel: (1) allowed the jury to hear and consider evidence that petitioner had been convicted of a felony; (2) failed to object to out-of-court statements identifying petitioner as the shooter; (3) failed to object to the prosecutor's references to petitioner's admissions to a third party; (4) failed to object when the prosecutor asked petitioner whether

6

the prosecution witnesses had lied; and (5) failed to object to testimony that petitioner sold drugs. Petitioner also contends he was prejudiced by the cumulative effect of these deficiencies in counsel's performance.

A claim of ineffective assistance of counsel is cognizable as a claim of the denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that his attorney's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. See id. at 688. The relevant inquiry is not what defense counsel could have presented, but rather whether the choices made by defense counsel were reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). Second, he must establish that he was prejudiced by his attorney's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See id. It is unnecessary for a federal court considering an ineffective assistance claim to address the prejudice element of the Strickland test if the petitioner is unable to establish incompetence under the first prong. See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. See Strickland, 466 U.S. at 697.

Here, in denying petitioner's ineffective assistance claims, the California Court of Appeal applied the Strickland standard.[2] As this is the correct federal standard for evaluating such claims, the state court's denial of petitioner's claims was not "contrary to" clearly established federal law within the meaning of § 2254(d)(1). See Williams, 529 U.S. at 406

---

[2] In this case, the Court reviews the opinion of the California Court of Appeal because it is the last reasoned state court opinion to deny petitioner's claims. (Slip Op. at 8-9); see LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

(holding state court's <u>Strickland</u> analysis generally does not fall within the "contrary to" clause); <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000) (explaining that where state court applies <u>Strickland</u>, federal habeas petitioner's claims should be analyzed under "unreasonable application" prong, not "contrary to" prong, of § 2254(d)). For the reasons explained below, the state court's denial of petitioner's claims did not "involve an unreasonable application of" federal law within the meaning of § 2254(d)(1).

        1.     <u>Evidence of Petitioner's Prior Conviction</u>

Petitioner claims his attorney was ineffective in allowing the jury to hear evidence of his prior felony conviction. One of the counts charged against petitioner was possession of a firearm by an ex-felon, the prior felony being possession of narcotics. Prior to trial, petitioner admitted the prior felony in order to take advantage of California case law that precludes the introduction at trial of evidence concerning the nature of the prior conviction, which evidence otherwise would have been admitted to prove the prior felony element of the firearm charge. <u>See</u> <u>People v. Valentine</u> (1986) 42 Cal.3d 170, 173. At trial, petitioner's attorney asked petitioner about this felony conviction, and petitioner admitted to its existence; petitioner did not, however, divulge the nature of such conviction. Both the prosecutor and defense counsel referred to the existence, but not the nature, of the conviction in their closing arguments.

        a.     <u>Severance or Bifurcation of the Firearm Possession Count</u>

Petitioner claims his attorney should have protected him from the prejudice associated with his prior felony conviction, by requesting either severance or bifurcation. Had counsel done so, petitioner argues, the felon-in-possession count would have been tried after the murder charge, thereby obviating the need for the jury to know petitioner had a prior felony at the time they were considering the murder charge.[3]

In rejecting this claim, the California Court of Appeal found that neither a motion for severance nor for bifurcation would have been granted under California law. (Slip Op. 10-13)

---

[3] The California Court of Appeal explained that a felony conviction for simple possession of narcotics could not be used for impeachment because it does not necessarily involve moral turpitude. (Slip Op. at 11.)

8

1  (citing Cal. Pen. Code §§ 954, 954.1, 1044, and California case law).  Such determination of
2  state law is binding on this Court on habeas review.  See Hicks v. Feiock, 485 U.S. 624, 629,
3  630 n.3 (1988) (holding determination of state law by intermediate state appellate court is
4  binding on federal court conducting habeas review).  As this Court is bound by the state
5  court's conclusion that a motion for severance or bifurcation would not have succeeded under
6  state law, counsel's failure to bring such a motion does not constitute ineffective assistance.
7  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (holding counsel cannot have been
8  ineffective for failing to raise meritless motion).

        b.      <u>Failure to Inform Jury of the Nature of the Prior Conviction</u>

10 Petitioner also argues that counsel was ineffective in failing to disclose to the jury the
11 "non-serious" nature of his prior conviction for narcotics possession.  He asserts the
12 withholding of this information led the jury to equate his prior conviction with the more serious
13 prior convictions of the other witnesses at trial.[4]
14 There are legitimate tactical reasons for counsel's decision not to inform the jury of the
15 nature of petitioner's prior conviction.  Counsel could not have been sure how the jury would
16 react to, or what inferences it would draw from, evidence of petitioner's prior involvement with
17 drugs.  In particular, there was a significant risk that the jury would associate petitioner's drug
18 involvement with violence.  In short, a reasonable determination could be made that the jury's
19 reaction to the evidence of drug possession was too unpredictable to risk disclosure of that
20 evidence.  As there were valid tactical reasons for counsel's failure to disclose the nature of
21 petitioner's prior conviction, counsel's performance was not objectively unreasonable in this
22 respect.

        c.      <u>Questioning Petitioner About Prior Conviction</u>

24 Petitioner further contends that his counsel should not have asked him on direct
25 examination about his prior conviction.  During direct examination, petitioner's counsel asked

---

[4] Armstrong had been convicted of felony car theft, attempted robbery and possession for sale of narcotics.  Soriano had been convicted of assault with a deadly weapon and possession for sale of a controlled substance.

9

1  petitioner, "Mr. Weathers, you've been convicted of a felony haven't you?", to which petitioner
2  responded, "Yes."  (Reporter's Transcript ("RT") (attached as Respt.'s Exh. B) 514).  During
3  closing argument, counsel stated, "Mr. Weathers came to you.  He admitted he had been
4  convicted of a felony.  You can use that to judge his credibility.  You can also use a lot of other
5  things he told you [that were] corroborated by other evidence."  (RT 643).

6        Again, there were legitimate tactical reasons for counsel's preemptively questioning
7  petitioner about the prior felony conviction.  First, such questioning serves to take some of the
8  sting out of the fact of the prior conviction.  Second, the existence of a prior felony conviction
9  was a necessary element of the prosecution's case for the felon-in-possession charge, which
10 element the prosecution was entitled to prove.  Indeed the parties entered into a stipulation as
11 to the existence of a felony conviction, and the jury was so informed.  RT 587-88.[5]  Moreover,
12 petitioner's admitting the prior conviction provided his counsel the opportunity to argue that
13 petitioner is forthright about his past, has nothing to hide, and when he is guilty of something,
14 he admits to it.  Counsel reasonably could have decided that such early admission would be
15 preferable to petitioner's having to admit to the prior conviction on cross-examination, at which
16 point it might appear to the jury that petitioner had been trying to conceal it from them.  In light
17 of the legitimate tactical reasons for petitioner's early admission of his prior conviction,
18 counsel's decision to ask petitioner about that conviction on direct examination did not
19 constitute deficient performance.

21       2.    <u>Evidence that Others Identified Petitioner as Shooter</u>

22       Petitioner claims counsel was ineffective in failing to object to evidence of "anonymous
23 persons" identifying him as the shooter.  Soriano testified that he heard "rumours" that the
24 rented green Grand Am, which he had loaned to petitioner, was "involved" in a shooting, and
25 that he thereafter retrieved the green Grand Am and exchanged it for a red one.  (RT 41-42).
26 Additionally, a portion of Soriano's taped interview with the police was played for the jury,

---

[5] The existence of petitioner's prior conviction also became part of the evidence when the prosecutor questioned petitioner regarding his aliases.  RT 524-25, 542-44.

10

which portion contained a statement by Soriano that he had heard from unidentified sources that "Lonnie . . . was supposed to [be] the shooter." Armstrong testified during cross-examination that he picked petitioner's photograph from a photo lineup because Sergeant Clark "asked me to and told me that some people told him that was the shooter." (RT 279-80).[6] Petitioner asserts that such evidence constitutes inadmissible hearsay, and that counsel therefore should have objected to its introduction.

The California Court of Appeal rejected this claim after finding the testimony was not hearsay because it was not offered for the truth of the matter stated, see People v. Sanders, 11 Cal.4th 475, 511-12 (1995), but rather as evidence of the witness's state of mind. In particular, the evidence was relevant to the jury's assessment of the credibility of Soriano and Armstrong as witnesses. (See Slip Op. 16.) Consequently, counsel cannot be faulted for failing to object to the evidence on hearsay grounds. Nevertheless, counsel could have, and did not, request a limiting instruction. A limiting instruction that the evidence could not be considered for its truth, but only for the non-hearsay purpose of explaining the actions of Soriano and Armstrong, would have helped ensure that the jury did not use the evidence for an impermissible hearsay purpose.

Counsel's failure to seek a limiting instruction does not, however, provide a basis for habeas relief, because there is no reasonable probability that the outcome of the case would have been different if such an instruction had been given. See Strickland, 466 U.S. at 694 (setting forth prejudice standard necessary to establish a violation of Sixth Amendment right to counsel). Such rumours and other unattributed statements, even if considered by the jury without limitation, are unlikely to have made a difference in this case, given the strength of the other evidence against petitioner. In a police interview shortly after the shooting, Armstrong, who knew and recognized petitioner, identified petitioner as the shooter; and he reiterated that identification in a subsequent interview with the police. Although Armstrong recanted this

---

[6] Defense counsel had asked Armstrong if he identified petitioner in the lineup "because that was the person involved in the shooting?" (RT 279-80). Armstrong responded as indicated.

11

identification at trial, he provided the prosecution with a plausible explanation for any changes in his account, namely that he feared for his safety. Wade likewise was an eyewitness to the shooting who knew and recognized petitioner; and she also identified petitioner as the shooter, both to the police and at trial. In addition, Soriano, although an unwilling witness, provided testimony that shortly before the shooting, he had loaned petitioner a car matching the description of the car from which the shots were fired. Finally, Wade testified as to petitioner's motive for shooting Armstrong, namely that Armstrong had previously threatened petitioner with a gun and robbed him. By contrast, petitioner's alibi defense, that he was having his sister's car washed at the time of the shooting, was relatively weak, in that the work order from the "Sprinkle 'em Detail Center" was, at best, sketchy and, in particular, contained no reference to the time the work was done. Under such circumstances, petitioner has failed to demonstrate a reasonable probability exists that the outcome of the case would have been different if the trial court had given a limiting instruction. Accordingly, under <u>Strickland</u>, petitioner was not prejudiced by the failure to request such instruction.

        3.    <u>The Prosecutor's References to Petitioner's Admissions to a Third Party</u>

Petitioner claims that counsel was ineffective in failing to object to the prosecutor's questions regarding petitioner's admissions to a third party. During cross-examination, the prosecutor asked petitioner if information Jaron Bradshaw, a.k.a. Quincy ("Quincy"), had imparted to Sergeant Clark was true. In particular, during cross-examination of petitioner, the following exchange occurred:

> Q. Someone named Quincy, also known as Ron Bradshaw, told Sergeant Clark that you admitted to being in that car, he would be lying?
>
> A. Yes.
>
> Q. If someone told Sergeant Clark that you said that you were shooting at the guy who robbed you, that would be a lie too?
>
> A. Yes.
>
> Q. If someone named Quincy said that you told him that while the shooting was going on, you thought you might have hit a lady on the street, that would have been a lie, too?

12

```
            A.    Yes.
```
(RT 539.)

Petitioner claims the prosecutor's questions suggested a "non-evidentiary hearsay confession" by petitioner without any good faith belief that petitioner had in fact made those statements to Quincy. Because counsel failed to object to the prosecutor's improper inquiry, petitioner contends, his Sixth Amendment right to effective assistance of counsel was violated.

Under California law, the prosecutor must have a good faith belief in the foundation of the evidence he seeks to elicit from a witness. See People v. Ramos, 15 Cal.4th 1133, 1173 (1997). Consequently, it is "improper" for the prosecution to pose questions to a witness that suggest facts adverse to a defendant, absent a good faith belief that such facts exist. See People v. Osband, 13 Cal.4th 622, 695 (1996). Here, petitioner argues, the prosecutor was not required to provide a justification for his questions because petitioner's counsel made no objection. The record is silent as to whether the prosecutor would have been able to demonstrate he had a good faith belief in the foundation of his questions.[7]

Even assuming, arguendo, the prosecutor would not have been able to make such a showing, however, petitioner was not prejudiced by counsel's failure to object, in light of the trial court's instruction to the jury pursuant to CALJIC 1.02, by which the jury was expressly admonished that questions and statements by attorneys are not to be considered as evidence. The jury is presumed to have followed this instruction, see Tan v. Runnels, 413 F.3d 1101, 1105 (9th Cir. 2005), and, consequently, not to have considered as evidence any statement contained in the prosecutor's question. Under such circumstances, there is no reasonable probability that had defense counsel objected, the outcome of the case would have been different. Accordingly, this claim of ineffective assistance of counsel fails.

   4.   The Prosecutor's Questioning of Petitioner

Petitioner contends he received ineffective assistance of counsel because counsel

---

[7] Although the form of the questioning was argumentative to the extent the prosecutor asked petitioner whether Quincy was "lying," the substance of the questioning was a legitimate inquiry into prior inconsistent statements by petitioner to Quincy, assuming the prosecutor had a good faith belief that such conversation took place.

13

failed to object to the prosecutor's allegedly improper questions during cross-examination. On cross-examination, the prosecutor asked petitioner if Armstrong, Soriano, Wade and Sergeant Clark had lied in their previous testimony in which they identified and referred to petitioner as the shooter, and if so, how petitioner might know they were lying. Petitioner answered that the witnesses and Sergeant Clark were lying, although he offered no reason for them to do so.

The California Court of Appeal concluded that the prosecutor's questioning was improper because seeking petitioner's opinion on the veracity of the witnesses whose testimony differed from his own contravened the jury's role as "the sole judge of the credibility of the witnesses." (See Slip Op. at 19-20) (quoting People v. Watts, 76 Cal.App.4th 1250, 1258-59 (1999), and citing, inter alia, United States v. Henke, 222 F.3d 633, 643 (9th Cir. 2000); United States v. Sanchez, 176 F.3d 1214, 1219-20 (9th Cir. 1999)). Even assuming the prosecutor's questions were improper, petitioner was not prejudiced by counsel's failure to raise an objection. The jurors were instructed, pursuant to CALJIC No. 2.20, that they were the sole judges of the credibility of the witnesses and the weight to be given the testimony of each witness, and were further instructed, pursuant to CALJIC 1.02, that the statements and argument of counsel are not evidence. The jury is presumed to have followed these instructions,[8] and thus not to have based their assessment of petitioner's credibility on the wording of the prosecutor's questions. Given these instructions, as well as the strong evidence of petitioner's guilt discussed above, there is no reasonable probability that the verdict would have been different if counsel had objected to the prosecutor's questions. See, e.g., United States v. Boyd, 54 F.3 868, 871 (D.C. Cir. 1995) (finding jury instructions and strength of other evidence precluded finding of prejudice from prosecutor's improper questioning of defendant as to whether police officer witness was lying).

     5.    Armstrong's Statement that Petitioner Sold Drugs

Petitioner claims his counsel was ineffective in failing to object to the admission of out-

---

[8] See Tan v. Runnels, 413 F.3d 1101, 1115 (9th Cir. 2005) ("[W]e presume jurors follow the court's instructions absent extraordinary circumstances").

14

1  of-court statements by Armstrong that petitioner sold drugs. In explaining how he located
2  petitioner, Sergeant Clark testified that on the afternoon of the shooting, Armstrong directed
3  him to a nearby minipark and "indicated that [petitioner] hung out there and sold drugs." (RT
4  387.) Petitioner contends that Armstrong's statement, as testified to by Sergeant Clark, was
5  inadmissible hearsay and prejudicial.

   Counsel's failure to object to this testimony by Sergeant Clark was not deficient within the meaning of Strickland. The statement by Armstrong was not offered for the truth of the matter stated. Rather, it was offered for the non-hearsay purposes of explaining how Sergeant Clark located petitioner and to show Armstrong's familiarity with the shooter and strength of his initial identification. Although, as discussed earlier in connection with the introduction of other out-of-court statements, counsel could have requested a limiting instruction directing the jury not to consider Armstrong's statement for its truth, tactical reasons for counsel's failure to request such an instruction exist, in particular, the risk that an objection would draw attention to the statement.

   Moreover, Armstrong's actual statement was contained in a taped interview by Sergeant Clark, which tape was played to the jury shortly after the above-described testimony, as a prior identification by Armstrong of petitioner.[9] (RT 399; see Clerk's Transcript (Respt.'s Exh. A) Exh. 15-B at 2 .) On the tape, Armstrong's statement to Sergeant Clark with respect to the matter of drugs was equivocal; he told Sergeant Clark he had seen petitioner at the minipark "maybe selling drugs" (emphasis added). (See id.) The jury was instructed, pursuant to CALJIC 1.00, that they "must not be influenced by . . .conjecture." As noted, the jury is presumed to have followed the trial court's instructions. See Tan v. Runnels, 413 F.3d at 1105.

   Finally, given the brevity of the reference and the fact it was not emphasized by the prosecution at the time of its admission or used by the prosecution in argument, the statement

---

[9] During the playing of the tape recording, the jurors were allowed to follow along with a transcript of that recording, which they were required to return to the court at the conclusion of the playing.

15

is unlikely to have had an impact on the jury's verdict. As described above, the evidence of petitioner's guilt was strong. Petitioner has not shown a reasonable probability exists that counsel's failure to request a limiting instruction affected the verdict. Consequently, even if counsel was deficient in failing to seek a limiting instruction, petitioner was not prejudiced thereby.

### 6. Cumulative Prejudice

Lastly, petitioner contends he is entitled to habeas relief based on the cumulative prejudice arising from all of the above alleged errors. Petitioner has cited no Supreme Court decision, and the Court is not aware of any, that recognizes cumulative prejudice as an independent constitutional violation. In the absence of "clearly established federal law, as determined by the Supreme Court of the United States," habeas relief is not available under § 2254(d)(1). See Williams v. Taylor, 120 S. Ct. at 1523 (finding, under § 2254(d)(1), federal habeas claims must be based on Supreme Court authority, not decisions of lower federal courts). Moreover, to the extent such a claim has been recognized in the circuit courts, cumulative prejudice is generally found where the government's case is weak. See Thomas v. Hubbard, 273 F.3d 1164, 1179-81 (9th Cir. 2002); see also Walker v. Engle, 703 F.2d 959, 961-62, 968 (6th Cir. 1983). Here, for the reasons explained above, the government's case against petitioner was sufficiently strong that petitioner was neither prejudiced by the errors considered separately, nor was he prejudiced by the errors considered cumulatively. See, e.g., Thompson v. Calderon, 86 F.3d 1509, 1525 (9th Cir. 1996) ("[F]inding no prejudice from the errors considered separately, we also find no cumulative prejudice.") Accordingly, the cumulative prejudice from counsel's asserted errors does not form a basis for habeas relief in this case.

**CONCLUSION**

In light of the foregoing, the petition for a writ of habeas corpus is DENIED.

The Clerk shall close the file and terminate any pending motions.

**IT IS SO ORDERED.**

Dated: November 1, 2005

_____
MAXINE M. CHESNEY
United States District Judge

17